IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Wendy D. Whitfield,    )<br>                                                 )<br>                         Plaintiff,    )<br>                                                 )<br>     vs.                                      )<br>                                                 )<br>Carolyn W. Colvin,                  )<br>Commissioner of Social Security,  )<br>                                                 )<br>                         Defendant.    )<br>_____ ) | Civil Action No.  6:13-2409-DCN-KFM<br><br>**REPORT OF MAGISTRATE JUDGE** |

This case is before the court for a report and recommendation pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.), concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

The plaintiff brought this action pursuant to Section 205(g) of the Social Security Act, as amended (42 U.S.C. 405(g)) to obtain judicial review of a final decision of the Commissioner of Social Security denying her claim for disability insurance benefits under Title II of the Social Security Act.

**ADMINISTRATIVE PROCEEDINGS**

The plaintiff filed an application for disability insurance benefits ("DIB") on May 18, 2010, alleging that she became unable to work on March 12, 2010. The application was denied initially and on reconsideration by the Social Security Administration. On July 6, 2011, the plaintiff requested a hearing. The administrative law judge ("ALJ"), before whom the plaintiff and Pearl Brown, an impartial vocational expert, appeared on May 9, 2012 (Tr. 32), considered the case *de novo* and, on May 21, 2012, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended. The ALJ's finding

---

[1]A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

became the final decision of the Commissioner of Social Security when the Appeals Council denied the plaintiff's request for review on September 4, 2012. The plaintiff then filed this action for judicial review.

In making the determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

> (1)   The claimant meets the insured status requirements of the Social Security Act through June 30, 2015.
>
> (2)   The claimant has not engaged in substantial gainful activity since March 12, 2010, the alleged onset date (20 C.F.R §§ 404.1571 *et seq*).
>
> (3)   The claimant has the following severe impairment: disorders of the back and obesity (20 C.F.R. § 404.1520(c)).
>
> (4)   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526).
>
> (5)   After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. § 404.1567(a) except the claimant can occasionally climb ramps and stairs, but cannot climb ladders, ropes, or scaffolds. She is capable of frequent pushing and pulling activities. The claimant can kneel and balance frequently, but can only occasionally stoop, crouch, and crawl. The claimant must be allowed to use a hand-held assistive device for prolonged ambulation and allowed to sit/stand at her workstation as needed to relieve her pain symptoms. The claimant must avoid concentrated exposure to extreme heat, cold, or humidity, and she must avoid even moderate exposure to hazards such as unprotected heights or dangerous moving machinery.
>
> (6)   The claimant is unable to perform any past relevant work (20 C.F.R. § 404.1565).
>
> (7)   The claimant was born on August 9, 1960, and was 49 years old, which is defined as a younger individual age 45-49, on the alleged disability onset date (20 C.F.R. § 404.1563).

> (8) The claimant has a limited education and is able to communicate in English (20 C.F.R. § 404.1564).
>
> (9) The claimant has acquired work skills from past relevant work (20 C.F.R. § 404-1568).).
>
> (10) Considering the claimant's age, education, work experience, and residual functional capacity, the claimant has acquired work skills from past relevant work that are transferable to other occupations with jobs existing in significant numbers in the national economy (20 C.F.R. §§ 404.1569, 404.1569(a) and 404.1568(d)).
>
> (11) The claimant has not been under a disability, as defined in the Social Security Act, from March 12, 2010, through the date of this decision (20 C.F.R. § 404.1520(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals an illness contained in the Social Security Administration's Official Listings of

Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment. 20 C.F.R. § 404.1520. If an individual is found not disabled at any step, further inquiry is unnecessary. *Id.* § 404.1520(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62, 1982 WL 31386, at *3. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy that the plaintiff can perform despite the existence of impairments that prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. See *Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a

4

> preponderance. If there is evidence to justify a refusal to direct
> a verdict were the case before a jury, then there is "substantial
> evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that the conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## **EVIDENCE PRESENTED**

The plaintiff was 49 years old on her alleged disability date and had previously worked as a bingo runner and customer service representative at a gas station (Tr. 25, 138-39). The medical records indicate that the plaintiff had been treated for anxiety and back pain by her primary care physician, Patricia Campbell, M.D. On July 29, 2009, the plaintiff had a complete physical examination by Dr. Campbell. Dr. Campbell noted the plaintiff's past history of chronic low back pain and sciatica (Tr. 286-87). In her reports dated September 23, 2009, and February 24, 2010, Dr. Campbell noted that the plaintiff had chronic low back pain, pain in her right limb, depression, and anxiety and that all of these conditions were worsening (Tr. 289-90, 294-95).

On March 10, 2010, the plaintiff visited Dr. Campbell, complaining of pain in her back that radiated to both legs (Tr. 296). The plaintiff was prescribed Vicodin and was referred to Jason M. Highsmith, M.D., a neurosurgeon (Tr. 297).

In a letter dated March 16, 2010, Dr. Highsmith noted that the plaintiff has had "a history of severely exacerbated low-back pain", but she "has become increasingly incapacitated over the last couple of months. She says her legs often get weak and give out on her. She cannot tolerate significant activity. She has had physical therapy and

injections in the past with no relief." Dr. Highsmith noted that the plaintiff demonstrated a positive straight leg raise on the right, but had good strength in the lower extremities and brisk, symmetric reflexes. An MRI of the lumbar spine revealed significant spondylolisthesis, significant disc desiccation, and marked facet arthropathy (Tr. 200-01). Dr. Highsmith believed the plaintiff would be a good candidate for lumbar fusion surgery, apart from her obesity, and on April 2, 2010, he performed a lumbar fusion at the L5/S1 discs (Tr. 201-202, 254-55). The doctor noted that the plaintiff was slow to ambulate after surgery, but she was discharged on April 7, 2010, at which time she was mobilized (Tr. 202). On April 12, 2010, the plaintiff was having problems with constant, severe back pain that was worsened by sitting, standing, walking, and lying down (Tr. 210). On April 14, 2010, Dr. Highsmith noted that the plaintiff had persistent right leg pain after the previous lumbar fusion and performed a posterior decompression procedure, removing a fragment that had been causing significant pressure on the nerve root (Tr. 252).

During follow-up examinations on April 22, April 29, and in June 2010, Dr. Highsmith noted that the plaintiff continued to have myriad complaints, including low back pain radiating down her right leg and thigh. The doctor prescribed herbal remedies and Lortab (Tr. 262-65). X-rays from Trident Regional Hospital on June 10, 2010, showed plate and screws transfixing the anterior of the L5/S1 (Tr. 269). On July 20, 2010, the doctor noted that the plaintiff had some mechanical back pain but displayed good strength. The doctor was pleased with her progress and instructed her to increase her activity (Tr. 358).

On October 5, 2010, the plaintiff was treated at Trident Emergency Room for shortness of breath and chest pain. She was admitted to the hospital on October 6th and discharged on October 8, 2010. Upon discharge, the plaintiff was diagnosed with severe hypothyroidism, chronic back pain, and paresthesias (burning or prickling sensation that is usually felt in the hands, arms, legs, or feet) (Tr. 330-43). Dr. Campbell's follow-up report

from October 5th show the plaintiff as also having uncontrolled hypertension and pain in the throat (Tr. 412-13).

On October 19, 2010, Dr. Highsmith noted that the plaintiff was making progress and doing better, with some paraspinious pain on the right and could not walk very far without getting sore and tired. The doctor noted that she would likely always have some mechanical back pain, but hoped for continued improvement (Tr. 357).

On October 20, 2010, the plaintiff visited Dr. Campbell for a follow-up regarding back pain, among other things (Tr. 409). Dr. Campbell noted the plaintiff's obesity. Plaintiff displayed a normal gait, normal balance, and normal motor function (Tr. 410).

On December 21, 2010, the plaintiff visited Dr. Campbell and complained of back pain that radiated down both legs. She described her pain as a 5/10 while sitting and a 10/10 while moving (Tr. 407). Dr. Campbell noted that the plaintiff's gait, balance, and motor function were all normal. The doctor prescribed Percocet for pain (Tr. 408). Also on December 21, 2010, Dr. Campbell filled out a questionnaire regarding the plaintiff's mental condition where she wrote that the plaintiff's anxiety should not affect her ability to work, but that lower back problems did impact her ability to work (Tr. 368).

On January 24, 2011, the plaintiff saw Dr. Campbell and complained of back pain, among other things. The plaintiff reported that back surgery and use of Percocet had not helped with her pain (Tr. 405). The plaintiff reported that she had taken a neighbor's OxyContin pill the previous week, which had helped (Tr. 406). Dr. Campbell noted the plaintiff had a normal gait, normal balance, and normal motor function upon examination (Tr. 406).

On February 23, 2011, the plaintiff saw Dr. Campbell, complaining of pain in her back that radiated to her legs. The plaintiff reported that back surgery had not helped at all and that she felt worse (Tr. 403). The doctor prescribed a narcotic and

7

acetaminophen for pain (Tr. 404). On March 24, 2011, the plaintiff visited Dr. Campbell for a follow-up regarding back pain. The plaintiff reported feeling somewhat better since taking prescribed medication (Tr. 401). Dr. Campbell noted that the plaintiff's gait, balance, and motor function were normal. The doctor prescribed a narcotic and acetaminophen for pain (Tr. 402). On June 22, 2011, the plaintiff visited Dr. Campbell, again complaining of back pain, radiating to her right leg (Tr. 465). Dr. Campbell noted a normal neurological exam and prescribed pain medications (Tr. 466). On September 21, 2011, the plaintiff visited Dr. Campbell and reported that the severity of her pain had been stable with medication. Her neurological exam was normal (Tr. 467, 468).

On January 24, 2012, Dr. Campbell filled out an evaluation form regarding the plaintiff (Tr.471-74). On the form, the doctor opined that the plaintiff could lift less than ten pounds; could stand and walk less than two hours in an eight-hour day; could sit less than two hours in an eight-hour day; must alternate position every ten-to-twenty minutes; needed an at will sit/stand option; and would sometimes need to lie down at unpredictable intervals (Tr. 472). Dr. Campbell further opined that the plaintiff would be absent from work more than three times per month due to her impairments (Tr. 473). Dr. Campbell wrote that her opinions were supported by medical records from Dr. Highsmith and an MRI taken on March 3, 2010 (Tr. 472-74).

On March 14, 2012, the plaintiff visited Dr. Campbell for a follow-up regarding back pain, among other things (Tr. 481). The plaintiff's neurological exam was normal, and she received refills of her medications (Tr. 482).

### *Agency Evaluations*

On February 3, 2011, Jim Liao, M.D., reviewed the plaintiff's medical records and completed a Physical Residual Functional Capacity ("RFC") Assessment (Tr. 388-95). Dr. Liao opined that the plaintiff retained the ability to lift up to twenty pounds occasionally and ten pounds frequently; to stand and/or walk for about six hours (with normal breaks)

in an eight-hour day; and to sit for about six hours (with normal breaks) in an eight-hour day (Tr. 389). The doctor opined that the plaintiff could only occasionally climb, stoop, crouch, or crawl, and could only frequently balance or kneel (Tr. 390). The doctor opined that the plaintiff should avoid concentrated exposure to extreme heat, extreme cold, humidity, and hazards (Tr. 392).

On May 26, 2011, Hugh Wilson, M.D., reviewed the plaintiff's medical records and completed a Physical RFC Assessment (Tr. 452-59). Dr. Wilson opined that the plaintiff retained the ability to lift up to twenty pounds occasionally and ten pounds frequently; to stand and/or walk for about six hours (with normal breaks) in an eight-hour day; and to sit for about six hours (with normal breaks) in an eight-hour day (Tr. 453). The doctor opined that the plaintiff could only occasionally climb ramps or stairs; could only occasionally stoop, crouch, or crawl; could only frequently balance or kneel; and could never climb ladders, ropes, or scaffolds (Tr. 454). The doctor opined that the plaintiff should avoid concentrated exposure to extreme heat, extreme cold, humidity, and hazards (Tr. 456).

***Administrative Hearing Testimony***

At the May 9, 2012, hearing, the plaintiff testified that she was 51 years old (Tr. 41). She stated that she had previously worked as a customer service representative as a gas station, but had not worked since March 12, 2010 (Tr. 35). She testified that she completed the tenth grade (Tr. 40). The plaintiff stated that she lived with her husband and two dogs (Tr. 39). She stated that she was 5' 5" and weighed 274 pounds. She testified that she had gained weight because she was trying to quit smoking (Tr. 35).

The plaintiff testified that she was taking medication for depression, which was working pretty well (Tr. 44). The plaintiff testified that she could not lift more than ten pounds (Tr. 36). She stated that she could sit for a little while, before needing to get up and move around for a little while, at which point she needed to sit again (Tr. 38). The plaintiff

9

testified that she used a walker for ambulation and that bending and stooping hurt (Tr. 42). She testified that in a typical day, she sat at the computer, sat on the porch, walked around the porch, laid on the couch, and then sat in various chairs. She stated that her husband did the vast majority of the household chores. She testified that she could only shop in stores that provided a motorized cart (Tr. 43-44).

***Vocational Expert Testimony***

A vocational expert ("VE") testified that the plaintiff's past work as a cashier at a gas station was light and semi-skilled, while her past work as a bingo runner was light and unskilled (Tr. 46-47). The VE testified that from her past work, the plaintiff had gained the transferrable skills of: customer service, ability to operate a cash register, and ability to handle monetary transactions. The ALJ then asked the VE to assume a hypothetical individual of the plaintiff's age, education, and work experience, who could perform sedentary work that required only frequent pushing, pulling or kneeling; required only occasional climbing of ramps or stairs, stooping, crouching, or crawling; required no climbing of ladders, ropes, scaffolds; allowed for the use of an assistive device for prolonged ambulation; required no concentrated exposure to extreme cold, heat, and humidity; and required no more than moderate exposure to unprotected heights (Tr. 47-48). The ALJ inquired whether such a hypothetical person, with the plaintiff's transferrable skills, could perform her past work. The VE testified that such a person could not perform the plaintiff's past work, but could perform the representative jobs of food checker, check cashier, and telemarketer, all of which existed in significant numbers in the local and national economies. The VE provided the Dictionary of Occupational Titles ("DOT") codes for each of these jobs. The ALJ then asked the VE whether, if he were to add the requirement of a sit/stand option into the hypothetical question, the VE's response would change. The VE testified that there would be "no change" in her response with the addition of a sit/stand option (Tr. 48).

## **ANALYSIS**

The plaintiff argues that the ALJ erred (1) by failing to give proper weight to the opinions of her treating physician; (2) by failing to properly consider her obesity; (3) by failing to comply with Social Security Ruling ("SSR") 00-4p; and (4) by failing to clarify the issue regarding the sit/stand option in the VE's testimony.

### *Treating Physician*

The plaintiff first argues that the ALJ failed to properly consider the opinions of her treating physician, Dr. Campbell (pl. brief at 7-9). On December 21, 2010, Dr. Campbell filled out a questionnaire regarding the plaintiff's mental condition where she wrote that the plaintiff's anxiety should not affect her ability to work, but that lower back problems did impact her ability to work (Tr. 368). On January 24, 2012, Dr. Campbell filled out an evaluation form opining that the plaintiff could lift less than ten pounds; could stand and walk less than two hours in an eight-hour day; could sit less than two hours in an eight-hour day; must alternate position every ten-to-twenty minutes; needed an at will sit/stand option; and would sometimes need to lie down at unpredictable intervals. Dr. Campbell further opined that the plaintiff would be absent from work more than three times per month due to her impairments. Dr. Campbell wrote that her opinions were supported by medical records from Dr. Highsmith and an MRI taken on March 3, 2010 (Tr. 471-74).

The regulations require that all medical opinions in a case be considered, 20 C.F.R. § 404.1527(b), and, unless a treating source's opinion is given controlling weight, weighed according to the following non-exclusive list: (1) the examining relationship; (2) the length of the treatment relationship and the frequency of the examinations; (3) the nature and extent of the treatment relationship; (4) the evidence with which the physician supports his opinion; (5) the consistency of the opinion; and (6) whether the physician is a specialist in the area in which he is rendering an opinion. *Id.* § 404.1527(c)(1)-(5). *See also Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005). However, statements that a patient is "disabled" or "unable to work" or similar assertions are not medical opinions. These are

administrative findings reserved for the Commissioner's determination. SSR 96-5p, 1996 WL 374183, at *5.

The opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case. *See* 20 C.F.R. § 404.1527(c)(2); *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001). SSR 96-2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion. 1996 WL 374188, at *5. As stated in SSR 96-2p:

> [A] finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. §§ 404.1527 and 416.927. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

*Id.* at *4.

The ALJ gave "great weight" to Dr. Campbell's December 2010 opinion that the plaintiff's mental health conditions should not affect her ability to work as they posed only slight functional limitations (Tr. 24-25). The plaintiff contends, however, that the ALJ erred in failing to discuss Dr. Campbell's statement in the December 2010 opinion that lower back problems did "impact" the plaintiff's ability to work (*see* Tr. 368). However, as argued by the Commissioner, Dr. Campbell did not specify the nature or severity of the plaintiff's lower back problems, nor any ensuing limitations, and, therefore, the statement was not a "medical opinion" that the ALJ was required to weigh. *See* 20 C.F.R. § 404.1527(a)(2) ("Medical opinions are statements from physicians…that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis

12

and prognosis, what you can still do despite your impairment(s), and your physical . . . restrictions.").

The ALJ also considered Dr. Campbell's January 2012 opinion and reasonably determined that it was not entitled to significant weight (Tr. 25; *see* Tr. 471-74). The ALJ noted that Dr. Campbell's opinion was not consistent with her own treatment notes or the medical evidence as a whole (Tr. 25).  Specifically, the ALJ first pointed out that Dr. Campbell had relied on Dr. Highsmith's treatment notes in support of her opinion, despite the fact that Dr. Highsmith had offered no opinion regarding the plaintiff's alleged disability. The ALJ went on to explain that Dr. Highsmith's treatment notes actually reflected continuing improvement following the plaintiff's back surgery in April 2010 (*id.*). The record supports the ALJ's finding in this regard. For instance, on July 20, 2010, Dr. Highsmith noted that he was  pleased with the plaintiff's progress, and on October 19, 2010, Dr. Highsmith noted that the plaintiff was making progress and doing better, with some paraspinious pain on the right (Tr. 357-58). The doctor noted that the plaintiff would likely always have some mechanical back pain, but hoped for continued improvement (*id.*).

The ALJ also acknowledged that Dr. Campbell relied upon the March 2010 MRI findings in formulating her opinion (Tr. 25). However, as the ALJ noted, that MRI revealed only mild to moderate findings (Tr. 24; *see* Tr. 362). The ALJ also reasonably concluded that Dr. Campbell's own treatment notes did not support her January 2012 opinion that the plaintiff was unable to work (Tr. 25). For instance, as the ALJ noted, the plaintiff visited Dr. Campbell in March 2011 and reported feeling better with the use of prescribed medication with no side effects (Tr. 24; *see* Tr. 401). She also told Dr. Campbell that she received relief from pain in January 2011 after taking a neighbor's OxyContin (Tr. 406). Dr. Campbell also regularly reported that the plaintiff had a normal gait, normal balance, and normal motor function upon examination (Tr. 402, 406, 466, 468, 482).

Based upon the foregoing, the undersigned finds that the ALJ did not err in his consideration of Dr. Campbell's opinions.

***Obesity***

The plaintiff next argues that the ALJ erred in his findings regarding the effects of her obesity on her functioning (pl. brief at 9-10). Social Security Ruling 02-1p recognizes that obesity can cause limitations of function in sitting, standing, walking, lifting, carrying, pushing, pulling, climbing, balancing, stooping, crouching, manipulating, as well as the ability to tolerate extreme heat, humidity, or hazards. SSR 02-1p, 2000 WL 628049, at *6. These issues must be considered in assessing a claimant's RFC. *Id.* The ruling states that "individuals with obesity may have problems with the ability to sustain a function over time" and that "[i]n cases involving obesity, fatigue may affect the individual's physical and mental ability to sustain work activity." *Id.* The ruling also states:

> The combined effects of obesity with other impairments may be greater than might be expected without obesity. For example, someone with obesity and arthritis affecting a weight-bearing joint may have more pain and limitation than might be expected from the arthritis alone.

*Id.* Further, "[a]s with any other impairment, we will explain how we reached our conclusions on whether obesity caused any physical or mental limitations." *Id.* at *7.

Here, the ALJ noted that, in January 2011, Dr. Campbell's treatment notes revealed that the plaintiff was 65 inches tall and weighed 259.6 pounds, giving her a Body Mass Index score of 43.2 (Tr. 21 (citing Tr. 467)). The ALJ also noted the plaintiff's testimony at the 2012 hearing that she was currently 274 pounds, having gained weight in an attempt to quit smoking (Tr. 23; *see* Tr. 35). The ALJ concluded that the plaintiff's Body Mass Index of 43.2 qualified her as a person of "extreme" obesity and then noted that individuals of extreme obesity are at greatest risk to suffer from obesity-related impairments (Tr. 24). Citing to SSR 02-1p, the plaintiff attempts to draw a distinction between "extreme"

14

and "morbid" obesity, claiming that she had crossed from one category to the other by 2012 (pl. brief at 9-10). However, relying on guidelines from the National Institutes of Health, SSR 02-1p categorizes any individual with a Body Mass Index of 40 or above as suffering from "extreme" obesity, representing the greatest risk for developing obesity-related impairments. SSR 02-1p, 2000 WL 628049, at *2.

The ALJ then examined the plaintiff's obesity in correlation with her functional abilities, accurately noting that records revealed the plaintiff was able to move about generally well; had good muscle tone; did not suffer from significant sleep apnea, continued heart disease, or uncontrollable blood pressure; and did not have trouble with manipulation (Tr. 24; *see* Tr. 402, 406, 466, 468, 482) (displaying a normal gait); Tr. 200, 358 (displaying good strength)). The ALJ then reasonably found that the plaintiff's obesity did not have a negative effect upon her ability to perform routine movement beyond that accounted for in the RFC finding, which limited the plaintiff to sedentary work with additional limitations (Tr. 24). The plaintiff points to a medical report of Dr. Highsmith from October 12, 2010, in which he stated that the plaintiff was not able to walk very far without getting sore and being tired (pl. brief at 10 (citing Tr. 357)). The ALJ specifically considered this report, which was made six months after the plaintiff's back surgery (Tr. 24). Dr. Highsmith also stated in the report that the plaintiff was making progress, feeling better, and did not request any prescribed pain medication (Tr. 357). The plaintiff also cites a medical record from October 5, 2010, showing that she had shortness of breath, uncontrolled hypertension, and chest discomfort (pl. brief at 10 (citing Tr. 413)). However, the treating physician specifically noted that the plaintiff had not been taking her blood pressure and thyroid medication, which aggravated her hypothyroidism and hypertension possibly causing the plaintiff's fatigue and shortness of breath (Tr. 412-14). Here, substantial evidence supports the ALJ's finding that the plaintiff's obesity did not limit her functioning beyond the RFC assessment.

***Vocational Expert***

Lastly, the plaintiff argues that the ALJ did not comply with the provisions of SSR 00-4p (pl. brief at 10-11), which provides in pertinent part:

> When a [vocational expert ("VE")] . . . provides evidence about the requirements of a job or occupation, the adjudicator has an affirmative responsibility to ask about any possible conflict between that VE . . . evidence and information provided in the [*Dictionary of Occupational Titles* ("*DOT*")]. In these situations, the adjudicator will:
>
> Ask the VE . . . if the evidence he or she has provided conflicts with information provided in the DOT; and
>
> If the VE's . . . evidence appears to conflict with the DOT, the adjudicator will obtain a reasonable explanation for the apparent conflict.
>
> When vocational evidence provided by a VE . . . is not consistent with information in the DOT, the adjudicator must resolve this conflict before relying on the VE . . . evidence to support a determination or decision that the individual is or is not disabled. The adjudicator will explain in the determination or decision how he or she resolved the conflict. The adjudicator must explain the resolution of the conflict irrespective of how the conflict was identified.

2000 WL 1898704, at *4.

As set forth more fully above, after testifying that a hypothetical individual of the plaintiff's age, education, work experience, and RFC could perform the representative jobs of food checker, check cashier, and telemarketer, all of which existed in significant numbers in the local and national economies, the ALJ then asked the VE whether, if he were to add the requirement of a sit/stand option into the hypothetical question, the VE's response would change. The VE testified that there would be "no change" in her response with the addition of a sit/stand option (Tr. 47-48). In the hearing decision, the ALJ inaccurately wrote that the VE testified that there was a conflict between the sit/stand requirement question and the *DOT*, when in fact the VE made no such statement (Tr. 26; *see* Tr. 46-50).

The plaintiff argues that the ALJ failed to comply with SSR 00-4p because he did not obtain a reasonable explanation for the apparent conflict between the VE's testimony and information in the *DOT* regarding the sit/stand option. However, as argued by the Commissioner, because the *DOT* does not address the subject of sit/stand options, there was no apparent conflict between the VE's testimony and the *DOT*. *Zblewski v. Astrue*, 302 F. App'x 488, 494 (7th Cir. 2008) (holding that VE's testimony was not in apparent conflict with *DOT* as *DOT* did not address sit/stand options, and thus ALJ did not err in failing to identify and explain such conflict). Accordingly, because the VE's actual testimony revealed no conflict with the *DOT*, the ALJ was not required to make any further inquiries (Tr. 46-50). The fact that the ALJ inaccurately reported that there was a resolved inconsistency with the *DOT*, when in fact there was no inconsistency, does not change the outcome or substance of his decision. *See Brown v. Astrue*, No. 0:10-CV- 01930-RMG, 2011 WL 2444672, at *4 (D.S.C. June 14, 2011) ("Error is harmless where Plaintiff "fail[s] to establish that this error affected the outcome of the case or changed the substance of the decision in any manner."). Based upon the foregoing, this allegation of error is without merit.

## **CONCLUSION AND RECOMMENDATION**

This court finds that the Commissioner's decision is based upon substantial evidence and free of legal error. Now, therefore, based upon the foregoing,

IT IS RECOMMENDED that the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

s/Kevin F. McDonald
United States Magistrate Judge

January 12, 2015
Greenville, South Carolina